Phillip **MARTLEY**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–73–217.

Court of Criminal Appeals of Oklahoma.

Feb. 25, 1974.

Rehearing Denied March 13, 1974.

Ronald G. Franklin, Enid, for appellant.

Larry Derryberry, Atty. Gen., Robert McDonald, Asst. Atty. Gen., William Thiebaut, Jr., Legal Intern, for appellee.

## OPINION

BLISS, Presiding Judge:

In the District Court, Garfield County, Case No. CRF–72–1246, appellant, Phillip Martley, hereinafter referred to as defendant, was charged and tried for the offense of Murder and convicted for the lesser offense of Manslaughter in the First Degree.

His punishment was fixed at thirty-five (35) years imprisonment; from that judgment and sentence, a timely appeal has been perfected to this Court.

The evidence adduced at trial from the testimony of witnesses Roy Hildebrand, Jerry Poschen and Arthur Hughes in summary revealed that during the evening of December 16 and the early morning hours of December 17, 1972, Hildebrand, Randy Beattie (who will hereinafter be referred to as deceased), John Long, Steve Landridge and Bill Heinrich attended a teen-hop at Medford, Oklahoma. After the hop, they returned to Enid arriving at approximately 12:45 a. m. After Long, Landridge and Heinrich were driven to their homes, Hildebrand testified that he and the deceased drove to Van Buren Square where they observed three girls, Willa Deneer, Dianne Ramsey and Leann Quallis, in a white 1965 Chevrolet. After a conversation with them, they entered their car and rode with them as they drove around Enid. After a short ride, they returned to Hildebrand's car at Van Buren Square and observed a front tire had been slashed. Hildebrand testified that while they were changing the tire, Poschen, Hughes and Richard Cagle arrived in a Volkswagen sedan. Hildebrand, Poschen and Hughes testified that while deceased was still changing the tire, a 1965 Chevrolet, identified by Hughes as the same car the girls, previously mentioned, were driving earlier that evening, arrived on the scene. Tony Allison emerged from the vehicle and asked if the group had seen a person named Paul Bullard. The Chevrolet then left the scene and returned a second time. Hildebrand stated that Ramsey and the defendant emerged from the Chevrolet and approached the deceased; that defendant's hand was behind his back; that defendant and Ramsey lunged at the deceased, throwing the deceased against the Volkswagen; and, that in self-defense, deceased began hitting the defendant about the head with the tire tool. Ramsey took the tire tool from the deceased's hand and began swing-

ing it at Hildebrand. Simultaneously, defendant was lunging at the deceased. Ramsey chased Hildebrand across the parking lot in a southerly direction and struck him on the shoulder, knocking him to the pavement. Hughes' testimony added the observation of the knife in the defendant's hand when he concealed it behind his back. Further, Hughes stated that as defendant rushed the deceased, he brought the knife from behind his back during the time deceased attempted to defend himself with the tire tool. After the altercation, Poschen, Cagle, Hughes and Hildebrand observed blood on the deceased's shirt and took him to the hospital.

Oliver Edward Crockett testified that he, Tony Allison, Chip Ramsey and defendant were together during the evening and early morning hours on the above mentioned time and date. Crockett stated they were together and seated in their car at Van Buren Square at the time the deceased and Hildebrand entered the 1965 Chevrolet the previously mentioned girls were driving. Further, on cross-examination, Crockett related that one of the three girls was Ramsey's wife, another was Allison's girlfriend, and a third was defendant's girlfriend. The evidence indicates that they were surveilling these girls as the girls had previously told them that they had had some difficulty with some boys bothering them. After the Chevrolet left the shopping center, defendant slashed a front tire and Allison ripped out the ignition wiring on Hildebrand's car. Thereafter, they followed the Chevrolet as far as the Sonic Drive-In, drove by the After Hours Club, and returned to the shopping center. Crockett's testimony regarding the events which transpired upon their return to the shopping center was substantially the same as the testimony of the above witnesses, adding further that after the altercation, defendant returned to the car and stated that he "cut the Dude." Thereafter, the four proceeded to another location. Crockett attempted to remove the Chevrolet sticker from the rear window of the car in which they were riding in an attempt to conceal the identification of their vehicle. Defendant burned his hat in an attempt to conceal his identity.

Mike Kirkpatrick, detective with the Enid Police Department, testified that on the morning of December 17, 1972, he responded to a call from the Emergency Room of Bass Hospital. Upon arriving at the hospital, he observed the deceased with three wounds in his left chest and one wound to the left temple.

On December 17, 1972, Ray Pickle, Undersheriff of Garfield County, testified that he received a call from the defendant's stepfather, Rawleigh Webster, requesting permission to be allowed to see the defendant in jail. According to Pickle, he took Webster to see the defendant and overheard the defendant tell Webster where he had hidden his knife. Pickle then informed Sergeant Davis, of the Enid Police Department, of the location of the knife.

Don Davis, of the Enid Police Department, testified that on December 17, 1972, subsequent to defendant's arrest, he advised the defendant of his constitutional rights. Davis further testified that he found State's Exhibit 1 at the location given to him by Undersheriff Pickle.

A. J. Chapman, Chief Medical Examiner for the State of Oklahoma, testified that he performed an autopsy of the body of the deceased on December 17, 1972. Dr. Chapman stated that there were three stab wounds to the chest and abdomen of the deceased and one stab wound to the deceased's left temple. According to Dr. Chapman, the abdominal and chest wounds were the cause of death.

Thereafter, the State rested.

For the defense, Chris Barton testified that on December 14, 1972, he filed a complaint against one Johnny Long and the deceased for assault and battery.

George P. Ross, M.D., testified that he treated an injury to the defendant's head while the defendant was in custody for the

above offense. Ross testified the area of the head which was treated was a delicate area and a severe blow could have rendered defendant unconscious or could have been fatal. Dr. Ross further testified that he found swelling and bruises on the top of defendant's head.

George (Chip) Ramsey testified that on the above evening, Willa Deneer, Dianne Ramsey and Leann Quallis had informed him and Allison that they had been bothered by some boys during the evening. They surveilled the girls in their car and observed Hildebrand and the deceased enter their car at the parking lot located at Van Buren Square. Ramsey stated that after the girls, accompanied by the deceased and Hildebrand, left the shopping center, Allison and defendant left their car, slashed one of the tires to Hildebrand's car, and removed some of the ignition wires. Thereafter, they left and later returned, observing several people standing about the car with one person changing the tire they had previously cut. They stopped and Allison conversed with the deceased. Allison asked them how the girls were and deceased replied, "They would be better if you popped the scabs off." During the conversation, the deceased began striking the defendant over the head with a tire tool. Thereafter, defendant engaged in altercation with the deceased. Ramsey's description of the events which transpired was substantially the same as previous testimony, however, his testimony implicated that the deceased was the aggressor in the altercation.

E'Loise S. DeVinney identified Defense Exhibit 1, a Judgment and Sentence, for Assault and Battery, committed by the deceased against Chris Barton.

Thereafter, the defense rested.

Defense counsel asserts first that the trial court erred in overruling his motion to strike purported surplusage from the Information. The text of the Information reads as follows:

". . . Said defendant did then and there unlawfully, wilfully, maliciously, intentionally and feloniously, without authority of law and with a premeditated design upon the part of said defendant to effect the death of a human being, to-wit: One Randy Beattie cut, slash and stab the body of the said Randy Beattie with a certain sharp, pointed, dangerous and deadly weapon, to-wit: *A Switchblade knife with a five-inch sharp, pointed steel blade, . . .*" (Emphasis added)

Counsel contends that the portion emphasized above is prejudicial surplusage as at preliminary hearing the knife was not introduced into evidence. Consequently, the allegation being unnecessary, the only purpose for its insertion is to inflame the jury. The State, on the other hand, contends it is not prejudicial.

The basic purpose of an Information in a criminal case is to provide notice to defendant of the crime for which defendant stands charged so that he may adequately defend himself. Fields v. State, Okl.Cr., 322 P.2d 431 (1958). Assuming arguendo, the insertion of a descriptive allegation which includes the instrument which is used to effect the death of deceased in a homicide prosecution. is surplusage, it is our opinion such a descriptive allegation cannot be considered prejudicial as it provides additional notice to the accused of the facts and circumstances of the case. Since surplusage in an Information must be misleading, contradictory of material elements as pleaded, or prejudicial to be grounds for relief on appeal, [Dunn v. State, 14 Okl.Cr. 452, 172 P. 463 (1918), Hatton v. State, 96 Okl.Cr. 227, 252 P.2d 170 (1952), Tooisgah v. State, 96 Okl.Cr. 340, 255 P.2d 281 (1953)], we find this proposition without merit as the allegation herein mentioned does not fall within the above authority.

Defense counsel next contends that State's Exhibit 1, the switch-blade knife, should have been suppressed and the trial court erred in introducing it into evidence. The evidence adduced at the hearing on

the motion to suppress revealed that after defendant was taken into custody, the arresting officer properly advised him of Miranda warnings. Subsequently, on the same date, defendant's stepfather conversed with the defendant while he was incarcerated in the Enid City Jail. Undersheriff Pickle was present with the defendant's stepfather at the time of the conversation. During the course of the conversation, the defendant informed his stepfather of the place where the knife was concealed. Thereafter, Pickle informed an Enid City detective of its location and the knife was recovered.

■■ Generally, a statement made in a conversation between the accused and a third party in the presence of a law enforcement officer is admissible without the prerequisite of Miranda warnings to the accused as the statements are not asserted in response to a custodial interrogation. Edwards v. State, Okl.Cr., 508 P.2d 699 (1973). It follows that a law enforcement officer, learning of the locality of concealed evidence by being present at a similar conversation as in *Edwards,* supra, likewise does not have to give Miranda warnings before receiving the information. Consequently, evidence found as a result of such information is admissible. Counsel suggests that the stepfather was coerced into eliciting this information by artifice of the officers. Neither the testimony of the officers nor the testimony of the stepfather adduced at the suppress hearing supports this assertion. We therefore find this proposition to be without merit.

■ In passing, defense counsel, in the above assignment of error, argues that the trial court erred in allowing the prosecutor to elicit irrelevant and immaterial evidence on direct examination, evidence outside the scope of the offense for which defendant was being prosecuted and remote to the events which transpired on the date of the homicide. We find argument of the counsel meritorious. However, considering the gravity of the offense and the evidence in its entirety, we find no manifestation of prejudice in the punishment imposed by the jury in its verdict. We therefore find the error to be harmless beyond a reasonable doubt and within 20 O.S.1971, § 3001, the harmless error statute.

■ Defendant next argues the court erred in denying bail after preliminary hearing. In the case of Kennedy v. State, Okl.Cr., 512 P.2d 201 (1973), this Court held that although Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) suspended the imposition of the death penalty, defendant still does not have a right to bond on what was previously categorized as a capital offense as the exclusion under Article II, Section 8, is still applicable. Considering the evidence adduced at preliminary hearing supports the magistrate's ruling binding defendant over for trial for the offense of Murder, the mandate of the above mentioned constitutional section prohibited bond. Consequently, the court did not err in denying bond after preliminary hearing.

Defense counsel argues in his final proposition of error that the court erred in excluding an instruction on the lesser included offense of Manslaughter in the Second Degree; that the court erred in its specific language of instruction 7; and, that the court erred in denying defendant's requested instructions 1, 2 and 3.

■■ In considering the assertion that the defendant was entitled to an instruction on the lesser included offense of Manslaughter in the second degree, we note the statement of facts heretofore presented and without detailed elaboration point out the evidence as adduced at trial reveals a theory of defense of justifiable homicide. The evidence in support of the States Case and this defense does not in this case support the argument that defendant was culpably negligent in taking the life of the deceased. It is not error to deny an instruction on a theory of defense when such an instruction is not supported by the evidence. Gray v. State, 97 Okl.Cr. 121, 258 P.2d 950 (1953). We therefore find this contention to be without merit.

Counsel next in his final proposition argues the specific language of the court's instruction 7 deprived the defendant of his right to self-defense. The language complained of reads as follows:

"You are further instructed that the right of self-defense is for one's protection, and it cannot be claimed as a defense by one who is, himself, the aggressor, or by one who voluntarily enters into a difficulty with a dangerous instrument or a dangerous weapon, no matter how great his danger may become later, or how imminent his peril may thereafter appear during the course of the difficulty."

In support of his argument, counsel submits the case of Townley v. State, Okl.Cr., 355 P.2d 420 (1960). We find *Townley,* supra, distinguishable to the case at bench. In *Townley,* supra, the above instruction was given to the jury. However, the court found the evidence adduced at trial was uncontroverted regarding the fact defendant had withdrawn from the affray for which he was charged. The court held the above instruction alone gave no consideration to the factual issue of withdrawal and without further instructions on the facts regarding the defendant's withdrawal, the instructions as a whole deprived the defendant of his right to self-defense as they were not fairly balanced on the question of whether defendant was the "aggressor" or whether he "voluntarily entered into the difficulty." The instant case is distinguishable in that there is no evidence of withdrawal of defendant.

◼ In the case of Brannon v. State, 24 Okl.Cr. 362, 217 P. 1060 (1923), this Court dealt with a factual situation similar in principle to the one in the case at bench. In that case the defendant entered into an altercation at a baseball game and during the scuffle, knifed a person whom he testified as his assailant. As a result, the victim of the wound died and defendant was charged with Murder. In that case this Court approved an instruction, which although not identical in its language, was virtually identical excepting minor differences in the language used. We find this language once again should be approved. Under the circumstances of this case, there is a question of whether defendant should be availed of a right of self-defense. There is no evidence of withdrawal and there is sufficient evidence to support the jury's conclusion that the defendant provoked the affray and was the aggressor. Considering the instructions as a whole, it is our opinion that the instruction was not erroneous nor prejudicial. It properly states the law regarding self-defense and fits within the facts adduced at trial. Consequently, we find the court did not err in giving the above portion of the instructions and this assignment of error to be without merit.

◼ Defendant finally suggests in his final proposition that the court erred in not giving defendant's requested instructions 1, 2 and 3. We find the principles of law in these instructions regarding the defense of justifiable homicide were sufficiently covered by the court's instructions. It is unnecessary for the court to give defendant's requested instructions when the theories are sufficiently covered under the instructions prepared by the court. Chandler v. State, Okl.Cr., 501 P.2d 512 (1972). We therefore find this assignment to be without merit.

The judgment and sentence is affirmed.

BRETT and BUSSEY, JJ., concur.